# STATE OF MICHIGAN

# COURT OF APPEALS

CAROL B. ALBERTI and LAWRENCE R. ALBERTI,

Plaintiff-Appellees,

v

SUNBAY REAL ESTATE INC., doing business as RE/MAX OF ELK RAPIDS and DONALD FEDRIGON JR.,

Defendant-Appellants.

UNPUBLISHED
October 30, 2018

No. 337921
Antrim Circuit Court
LC No. 16-009054-CH

Before: BECKERING, P.J., and RIORDAN and CAMERON, JJ.

PER CURIAM.

Defendants, Sunbay Real Estate, Inc., doing business as Re/Max of Elk Rapids, and Donald Fedrigon, Jr., appeal by leave granted[1] the trial court's order denying their motion for summary disposition of plaintiffs' claims based on the expiration of the contractually shortened limitations period. For the reasons stated below, we reverse the trial court's order denying defendants' motion for summary disposition.

## I. STATEMENT OF RELEVANT FACTS

The facts pertaining to this appeal are undisputed. Plaintiffs, Carol B. Alberti and Lawrence R. Alberti, owned a house in Rapid City, Michigan. On April 15, 2015, they entered into a one-year listing agreement with defendant Fedrigon, a licensed real estate broker and sole

---

[1] *Carol B Alberti v Sunbay Real Estate Inc*, unpublished order of the Court of Appeals, entered September 21, 2017 (Docket No. 337921). We also granted leave for Michigan Realtors® to file an amicus brief in support of defendants' position. *Carol B. Alberti v Sunday Real Estate, Inc*, unpublished order of the Court of Appeals, entered March 16, 2018 (Docket No. 337921).

-1-

owner of Sunbay Real Estate, Inc., to sell their house in exchange for a 5% sales commission.[2] The house initially listed for $999,000.

In May 2015, a buyer made an initial offer of $910,000 through real estate agent Ken Weaver. Plaintiffs countered through Fedrigon with an offer to sell the home for $965,000, which the buyer rejected. The same buyer later made another offer, this time for $938,000. Plaintiffs countered with an offer to sell for $957,000, which the buyer rejected by failing to respond within the period specified.

According to plaintiffs, they learned on or about June 2, 2015, that the buyer had scheduled another walkthrough of the property. Also on June 2, Weaver allegedly informed Fedrigon verbally that the buyer intended to offer $950,000 for the property, but Fedrigon told Weaver that plaintiffs " 'had no interest in continuing to communicate with the Buyer.' " After the walkthrough, Weaver purportedly telephoned Fedrigon with the $950,000 cash offer and followed up the phone call with a written offer via e-mail. Defendants contend that Weaver did not telephone Fedrigon with an offer, and assert that Fedrigon did not see the written offer attached to Weaver's June 2, 2015 email. However, it is undisputed that Fedrigon did not relay the $950,000 offer to plaintiffs. The offer expired and the buyer purchased a different house in the area. Plaintiffs claim that they learned about the $950,000 cash offer weeks later through a phone call with a different agent.

The only other offer for the house prior to expiration of the listing agreement with Fedrigon came in September 2015 and was for $810,000. After the listing agreement expired on April 15, 2016, plaintiffs elected not to renew the agreement with Fedrigon; instead, they engaged a different agent, who eventually sold the house for $840,000.

On December 22, 2016, plaintiffs commenced an action to recover damages for the lost sale. They alleged breach of contract, breach of fiduciary duty, fraudulent misrepresentation, silent fraud, entitlement to exemplary damages, and other claims. Defendants filed an answer on February 3, 2017, followed ten days later by a motion and supporting brief for summary disposition. They argued that plaintiffs' claims were barred by ¶ 25 of the listing agreement, which provides for a shortened limitations period as follows:

> **LIMITATION**: Seller and Brokerage Firm agree that any and all claims or lawsuits between the parties relating to this agreement must be filed no more than six (6) months after the date of termination of this agreement. The parties waive any statute of limitations to the contrary.

Defendants argued that ¶ 25 provided a six-month period after termination of the agreement during which either party could file a claim against the other. The listing agreement expired on April 15, 2016; accordingly, the limitation period expired six months later, on October 15, 2016.

---

[2] The listing agreement granted Re/Max permission to submit the property to the Northern Great Lakes Realtors Multiple Listing Service (MLS), and Re/Max would then split the commission equally with a buyer's agent if they did not find their own purchaser.

Plaintiffs filed their complaint on December 22, 2016, more than two months after expiration of the limitation period. Thus, their claim was barred by the contractually shortened limitations period and should be dismissed.

Plaintiffs replied that the six-month limitations period of ¶ 25 applied only if the sellers terminated the listing agreement by cancellation in accordance with the provisions of ¶ 27, which state:

> **TERMINATION**: If Seller chooses for any reason to unilaterally terminate this Listing Agreement, cancellation must be by mutual consent in writing. In addition to such commission as Broker may be entitled to under this Listing Agreement, Seller agrees to reimburse Broker for it's [sic] out-of-pocket expenses, administrative overhead, and to pay a reasonable hourly fee for personal services rendered.

Plaintiffs argued that, because the sellers did not terminate the agreement in accordance with ¶ 27, the shortened limitations period provided by ¶ 25 was not triggered. Accordingly, the limitations period did not expire on October 15, 2016, plaintiffs' claims were not barred, and the trial court should deny defendants' motion for summary disposition. In a brief supporting their position, plaintiffs relied on the holdings of two unpublished decisions of this Court that distinguished between the expiration of an employment contract and the termination of an employment contract.[3] Plaintiffs used this distinction to argue that the "date of termination" referred to in ¶ 25 excluded the agreement's expiration date. Plaintiffs argued alternatively that the six-month limitations period is unenforceable because it is ambiguous, since, as the parties' arguments demonstrate, the word "termination" is reasonably susceptible to two different meanings.

The trial court conducted a hearing on defendants' motion for summary disposition on March 27, 2017, after which it ruled from the bench. Although initially of the opinion that defendants' interpretation of ¶ 25 should prevail, the court decided to follow the two unpublished decisions relied upon by plaintiffs and to conclude that termination of the listing agreement did not encompass the agreement's expiration. In addition, the court opined that if there were an ambiguity in the listing agreement, it should be construed against the agreement's drafter, i.e., defendants. Based on this reasoning and the holdings of the unpublished opinions, the trial court denied defendants' motion for summary disposition, and issued a corresponding order. This appeal by leave granted followed.

## II. ANALYSIS

Defendants contend that the trial court erred in denying their motion for summary disposition. We agree. Defendants sought summary disposition under MCR 2.116(C)(7) and

---

[3] *William G. Stahl, III v UP Digestive Disease Assoc, P.C.*, unpublished per curiam opinion issued March 24, 2009 (Docket No. 276882) and *VHC, PC v Tarek Elshaarawy, MD*, unpublished per curiam opinion issued June 16, 2011 (Docket No. 297625).

MCR 2.116(C)(8), asserting that plaintiffs' claim was barred by the shortened period of limitations provided for in the listing agreement. We review de novo a trial court's decision on a motion for summary disposition. *Lockport Twp v City of Three Rivers*, 319 Mich App 516, 519; 902 NW2d 430 (2017). We also review de novo questions involving the proper interpretation of a contract or the legal effect of a contractual clause. *Rory v Continental Ins Co*, 473 Mich 457, 464; 703 NW2d 23 (2005).

The parties dispute the interpretation of "termination" as it appears in ¶ 25 of the listing agreement. Defendants contend that the trial court should have interpreted "termination" in ¶ 25 according to its plain and ordinary meaning to include expiration of the listing agreement by its own terms. Contrariwise, plaintiffs contend that ¶ 27 of the listing agreement defines termination for purposes of the entire agreement as an act of the seller to end the agreement prior to its expiration. Therefore, the trial court did not err because termination does not include expiration of the agreement. We conclude that defendants have the better argument in this instance.

The main goal in interpreting a contract is to honor the parties' intent as discerned from the words used in the contract. *Davis v LaFontaine Motors, Inc*, 271 Mich App 68, 73; 719 NW2d 890 (2006). In construing a contract, courts "assign[] the words in the contract their ordinary and plain meaning if such would be apparent to a reader of the instrument." *Auto Owners Ins Co v Seils*, 310 Mich App 132, 145; 871 NW2d 530 (2015) (quotation marks and citation omitted). When necessary, a court may consult a dictionary "to ascertain the plain and ordinary meaning of words or phrases used in the contract." *Id*. Courts must "look at the contract as a whole and give meaning to all its terms[,]" construing and applying unambiguous contract provisions as written. *Id*. (quotation marks and citation omitted). "A contract is ambiguous when, after considering the entire contract, its words may reasonably be understood in different ways." *Id*. at 146.

Plaintiffs' assertion that ¶ 27 defines the word "termination" is unsupported by the language of the paragraph and the structure of the document. To define a word is to discover and set forth the word's meaning. *Merriam-Webster's Collegiate Dictionary* (11th Ed), p 327. Nothing in the text of ¶ 27 sets forth the meaning of "terminate" or "termination." Rather, the thrust of the paragraph is to specify the financial responsibilities of a seller who chooses to terminate the listing agreement prematurely, through cancellation. The language of ¶ 27 does not restrict the meaning of termination to that of early cancellation by the seller, and the language in ¶ 25 does not limit the meaning of termination to the act of cancellation described in ¶ 27.

Further, the structure of the document also contradicts plaintiffs' assertion that ¶ 27 defines the word "termination." It is a cardinal principle of contract interpretation that courts should not consider contract terms in isolation. *Hastings Mut Ins Co v Safety King, Inc*, 286 Mich App 287, 297; 778 NW2d 275 (2009). Rather, they should construe a contract as a whole and harmonize all the parts so far as reasonably possible. *Laevin v St. Vincent De Paul Society of Grand Rapids*, 323 Mich 607, 609-610; 36 NW2d 163 (1949). To argue that the content of ¶ 27 defines the paragraph's heading, "**TERMINATION**," implies that this one paragraph should be understood differently from all of the others. In other words, the argument implies that the content of ¶ 27 defines its heading, "termination," even though the content of the other paragraphs clearly do not define their respective headings.

-4-

The listing agreement consists of a preface followed by 29 paragraphs; it does not contain a "definitions" section. An all-caps heading in bold type followed by a colon precedes the substantive content of each paragraph. Reading the listing agreement objectively leads to the conclusion that these headings announce for the reader's convenience the subject of their respective paragraphs. In no way can it be said that the individual paragraphs "discover and set forth the meaning" of their corresponding headings. For example, the text following the heading "**ATTORNEY'S FEES**" does not define attorney's fees, it merely indicates that the prevailing party in any lawsuit will be entitled to reasonable attorney's fees paid by the non-prevailing party. Likewise, headings such as "**CLOSING FEES**," "**SHOWINGS/SIGNS**," and "**INDEMNIFICATION**" are not defined by the text that follow. Nothing on the face of the agreement indicates that the relationship between the heading and the text of ¶ 27 differs from the relationship between the heading and the text of the other 28 paragraphs in the document. Thus, the text of ¶ 27 no more defines "**TERMINATION**" than the text of the paragraphs on attorney's fees, closing fees, showings/signs, and indemnification defines any of those terms.

Where the parties have not expressly defined a term or used it in a technical sense, one should construe the word according to its plain and ordinary meaning. See *Cole v Auto-Owners Ins Co*, 272 Mich App 50, 53; 723 NW2d 922 (2006). To determine the plain and ordinary meaning, the Court may refer to a dictionary. *Id*. Used as a noun, "termination" means an "end in time or existence," or "the act of terminating." *Merriam-Webster's Collegiate Dictionary* (11th Ed), p 1289.[4] "[T]he act of terminating," contrary to plaintiffs' contention, does not necessarily require an agent; a thing may terminate of its own accord. See *Merriam-Webster's Collegiate Dictionary*, at p 1289 (noting that "conclusion" is synonymous with "termination," and providing the example: "the [termination/conclusion] of life"). In accordance with this analogy, the listing agreement could end under its own terms, i.e., expire, or the seller and broker could mutually agree to end it, i.e., through cancellation.

Further, as defendants assert, "termination" is synonymous with "expiration." The relevant definition of expiration is: "**2:** the fact of coming to an end or the point at which something ends: TERMINATION."[5] *Merriam-Webster's Collegiate Dictionary*, p 440. Thus, according to the plain and ordinary meaning of termination, "the date of termination of this

---

[4] Plaintiffs point out that *Black's Law Dictionary* (10th ed), defines "termination" as "[t]he *act* of ending something" (Plaintiffs' brief on appeal, p 12) (emphasis added by plaintiffs). However, this definition occurs within a specific legal context. *Black's* gives "extinguishment" as a synonym and illustrates its use by the phrase "termination of the partnership by winding up its affairs." *Id*. Definitions also are provided for "termination of conditional contract" and "termination of employment." *Id*. In terms of a general definition, *Black's* defines "termination" as "[t]he end of something in time or existence; conclusion or discontinuance . . . ." *Id*. These are consistent with the plain and ordinary meanings provided by *Merriam-Webster's*. With the exception of arguing that ¶ 27 defines "termination," plaintiffs do not argue that the parties used the word other than in its plain and ordinary sense.

[5] Words printed in caps indicate a "synonymous cross-reference." *Merriam-Webster's Collegiate Dictionary*, at p 8a.

agreement" signifies the date when the listing agreement ended, regardless of whether it ended by expiration or by cancellation. Thus, the meaning of ¶ 25's phrase, "the date of termination of this agreement," encompasses the date of the agreement's expiration on April 15, 2016. Therefore, expiration of the agreement triggered the six-months limitation period provided for in ¶ 25, which limitations period expired on October 15, 2016, two months before plaintiffs filed their complaint.

As previously indicated, the trial court found persuasive this Court's holdings in *William G. Stahl, III v UP Digestive Disease Assoc, P.C.*, unpublished per curiam opinion issued March 24, 2009 (Docket No. 276882) and *VHC, PC v Tarek Elshaarawy, MD*, unpublished per curiam opinion issued June 16, 2011 (Docket No. 297625), and applied their holdings to this case. However, "unpublished opinions are not precedentially binding under the rule of stare decisis," MCR 7.215(C)(1), and the fact that two unpublished decisions reach the same conclusion does not somehow make them binding. Moreover, the instant case is sufficiently distinguishable from *Stahl* and *Elshaarawy*, which involved employment cases, covenants not to complete, and the interpretation of precise language in specific employment contracts, to make the holdings in those cases inapplicable to the facts of this one. In short, this Court's holdings in *Stahl* and *Elshaarawy*, do not compel the conclusion in the case at bar that "the date of termination" necessarily excludes the date the listing agreement expired.

Plaintiffs alternatively argue that even if this Court disagrees that "termination" refers only to a seller's act to cancel the agreement prior to its expiration, summary disposition is still inappropriate because the word "termination" is ambiguous. This argument is unavailing.

An ambiguity exists when two provisions irreconcilably conflict, or when a term is equally susceptible to more than one meaning. *Coates v Bastian Bros, Inc*., 276 Mich App 498, 503; 741 NW2d 539 (2007); see also *Klapp v United Ins Group Agency, Inc*, 468 Mich 459, 467; 663 NW2d 447 (2003). "However, if a contract, even an inartfully worded or clumsily arranged contract, fairly admits of but one interpretation, it may not be said to be ambiguous or fatally unclear." *Michigan Twp Participating Plan v Pavolich*, 232 Mich App 378, 382; 591 NW2d 325 (1998). The mere fact that a term is not defined does not render that term ambiguous. See *Henderson v State Farm Fire & Cas Co*, 460 Mich 348, 354; 596 NW2d 190 (1999). Further, an ambiguity is not found simply because different dictionary definitions exist for the undefined term. *Koontz v Ameritech Servs, Inc*., 466 Mich 304, 317-318; 645 NW2d 34 (2002).

Plaintiffs' contention that "termination" is ambiguous because it can mean either "actively discontinuing a contract that was meant to continue" or "allowing the contract to expire" merely conflates the plain and ordinary meaning of the word "termination" with the multiple ways in which termination may occur. As indicated above, termination refers to an end; how that end comes about is not part of the word's definition. Thus, the cancellation of the agreement and the expiration of the agreement both result in "the date of termination of th[e] agreement." Moreover, understanding termination according to its general definition does not result in conflicting interpretations of ¶¶ 25 and 27. Paragraph 27 addresses the consequences to sellers who seek to end the agreement by cancellation prior to the end of the agreement through expiration, and ¶ 25's "date of termination of this agreement" refers to the date when the agreement ends, regardless of the means by which it ends. There being no ambiguity in ¶ 25, the trial court should have enforced the contractually shortened period of limitations by granting

defendants' motion for summary disposition.[6]  See *Rory*, 473 Mich at 471, 491 ("An unambiguous contractual provision providing for a shortened period of limitations is to be enforced as written unless the provision would violate law or public policy.").

Reversed and remanded to the trial court for further proceedings consistent with this opinion.  We do not retain jurisdiction.

/s/ Jane M. Beckering
/s/ Michael J. Riordan
/s/ Thomas C. Cameron

---

[6] Even if the language were ambiguous, the trial court erred by construing the agreement against the drafter.  The rule that ambiguities are to be construed against the drafter of the contract "is only to be applied if all conventional means of contract interpretation, including the consideration of relevant extrinsic evidence, have left the jury unable to determine what the parties intended the contract to mean." *Klapp v United Ins Group Agency, Inc*, 468 Mich 459, 471; 663 NW2d 447 (2003).