*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

---

COLLIERS INTERNATIONAL DETROIT LLC,

      Plaintiff-Appellee,

v

SIGNATURE ASSOCIATES INC,

      Defendant/Third-Party Plaintiff,

and

14 MACK LP,

      Defendant/Third-Party Plaintiff-
      Appellant/Cross-Appellee,

and

THE DUFRESNE SPENCER GROUP LLC,

      Third-Party Defendant-
      Appellee/Cross-Appellant.

UNPUBLISHED
April 23, 2026
11:41 AM

No. 372916
Oakland Circuit Court
LC No. 2022-196197-CB

---

COLLIERS INTERNATIONAL DETROIT LLC,

      Plaintiff-Appellee,

v

SIGNATURE ASSOCIATES INC,

      Defendant/Third-Party Plaintiff-
      Appellant,

and

No. 373163
Oakland Circuit Court
LC No. 2022-196197-CB

-1-

14 MACK LP,

        Defendant/Third-Party Plaintiff,

and

THE DUFRESNE SPENCER GROUP LLC,

        Third-Party Defendant/Defendant-
        Appellee.

---

COLLIERS INTERNATIONAL DETROIT LLC,

        Plaintiff,

v

SIGNATURE ASSOCIATES INC and 14 MACK
LP,

        Defendants/Third-Party Plaintiffs-
        Appellees,

and

THE DUFRESNE SPENCER GROUP LLC,

        Third-Party Defendant-Appellant.

No. 375079
Oakland Circuit Court
LC No. 2022-196197-CB

---

Before:  CAMERON, P.J., and BORRELLO and SWARTZLE, JJ.

PER CURIAM.

In Docket No. 372916 of these consolidated appeals,[1] defendant/third-party plaintiff 14 Mack LP (14 Mack) appeals as of right the trial court's order granting plaintiff's, Colliers International Detroit LLC's (Colliers), motion for partial summary disposition under

---

[1] Docket Nos. 372916 and 373163 were first consolidated on November 13, 2024, *Colliers Int'l Detroit LLC v Signature Assoc Inc*, unpublished order of the Court of Appeals, entered November 13, 2025 (Docket Nos. 372916 and 373163).  A subsequent order was later entered adding Docket No. 375079 on May 21, 2025. *Colliers Int'l Detroit LLC v Signature Assoc Inc*, unpublished order of the Court of Appeals, entered May 21, 2025 (Docket Nos. 372916, 373163, and 375079).

MCR 2.116(C)(10) (no genuine issue of material fact). In Docket No. 373163, defendant/third-party plaintiff, Signature Associates Inc (Signature), appeals as of right from the same order. In Docket No. 375079, third-party defendant, The Dufresne Spencer Group, LLC (DSG) appeals as of right from the trial court's order denying its motion for attorney fees. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

This case involves a dispute over a broker's entitlement to a brokerage fee from a commercial lease. DSG leased of a portion of 14 Mack's property in Warren, Michigan (the property). DSG hired Colliers as its broker to help it find a property to open a new furniture store; Signature served as 14 Mack's broker. During the search for a property, a Colliers representative reached out to Signature on behalf of DSG. Colliers's communication to Signature included a proposed Letter of Intent (LOI) that did not indicate a specific suite, but instead listed DSG's requirements, indicating that 14 Mack would propose a location that satisfied those requirements. The proposed LOI included a brokerage fee provision identifying Colliers as DSG's exclusive broker.

Signature responded with comments to the proposed LOI, including accepting the brokerage fee arrangement. After DSG toured the property with Colliers, it, Colliers, and 14 Mack signed a final LOI for the area now known as Suite 100.[2] The LOI, printed on Colliers letterhead, included a brokerage fee provision indicating that Colliers was DSG's exclusive agent and that 14 Mack was responsible for paying it a commission in accordance with 14 Mack's exclusive listing agreement (ELA) with Signature. The ELA required that Signature "cooperate in good faith with outside brokers" and awarded commissions to cooperating brokers for "any lease procured by [Signature] with the assistance of [the cooperating broker]." If a cooperating broker was entitled to a commission, 14 Mack paid both the broker and Signature 2.5% of the total base rent. If there was no cooperating broker, Signature received a 4% commission.

The parties began negotiating a lease agreement but could not agree on its terms, and 14 Mack ultimately leased Suite 100 to DSG's competitor. DSG then terminated Colliers, in part due to dissatisfaction with Colliers's performance in the Suite 100 negotiations. Shortly thereafter, DSG reached out to 14 Mack directly, seeking to lease another suite in the property. DSG and 14 Mack negotiated directly, without Colliers, and Signature was only involved in another tour of the property. DSG sent a new proposed LOI, this time on DSG letterhead, to 14 Mack for Suite 500. The new proposed LOI included a brokerage fee provision indicating that Colliers was DSG's agent and entitled to a commission. During the new LOI negotiations, 14 Mack removed the Colliers brokerage fee provision twice, noting that Colliers was not entitled to a commission because it was not involved in the negotiations for Suite 500. Throughout these exchanges, DSG sent copies of the LOI to Colliers, and Colliers called Signature to ensure that it would be paid its commission. According to Colliers, Signature agreed to explain the situation to 14 Mack and have Colliers put back in the LOI; Signature claimed no such promise was made.

Eventually, DSG consented to removing Colliers from the brokerage fee provision, explaining that it only included the provision because Colliers represented it had an agreement

---

[2] The property was ultimately divided into five suites. At issue in this case are Suites 100 and 500.

with Signature. The new LOI was ultimately signed, with the brokerage fee provision claiming that the only broker involved in the deal was Signature. DSG and 14 Mack then signed a lease agreement for Suite 500, which included a brokerage fee provision that stated:

> <u>Broker</u>. The parties acknowledge and agree that neither of them has used the services of a broker or leasing agent or any other person to whom a commission is or may be owed, other than Signature Associates, representing Landlord. Commissions to the referenced brokers are paid pursuant to a separate agreement. Except as otherwise provided in this Section 42, each party agrees to indemnify and hold harmless the other against any claims by a third party for payment of a commission or other fee in connection with this lease.

The agreement also had an indemnification provision that stated, in relevant part, that DSG would indemnify 14 Mack and Signature for third-party claims arising out of DSG's breach of the lease agreement, provided that the harm to the third party did not arise "from the gross negligence or willful misconduct" of 14 Mack or Signature.

Colliers ultimately filed this lawsuit after 14 Mack refused to pay it a commission, and 14 Mack and Signature filed third-party complaints against DSG for contractual and common-law indemnification. Relevant to this appeal, the complaint alleged that Colliers was a third-party beneficiary of the ELA that was entitled to a commission. Colliers moved for summary disposition of this count, which the trial court granted, agreeing with Colliers that it was the intended third-party beneficiary of the ELA. The trial court explained that the ELA provided commissions for cooperating brokers for "any lease" they assisted Signature in procuring, and did not require that the broker participate in negotiations for the specific lease ultimately procured. The trial court reasoned that, because Colliers introduced DSG to Signature, it unquestionably assisted Signature in procuring a lease with DSG, even if that lease was not for the originally intended Suite 100.

The trial court later held a bench trial on the remaining issue of whether DSG was obligated to indemnify 14 Mack and Signature for Colliers's commission. The trial court ruled that, while DSG breached the lease agreement by claiming to not be represented by any broker, 14 Mack and Signature were not entitled to contractual indemnification because they were grossly negligent and committed willful misconduct under the terms of the lease agreement. Specifically, it reasoned that 14 Mack and Signature knew Colliers was involved and that it was claiming a commission, but Signature refused to communicate with 14 Mack and 14 Mack refused to pay. Moreover, neither was entitled to common-law indemnification because they were at least partially at fault. As a result, the trial court ordered Signature to remit the portion of its 4% commission to which it was not entitled, and for 14 Mack to pay the remainder to Colliers for its 2.5% commission. DSG moved for prevailing party attorney fees as provided under the lease agreement, but the trial court denied the motion because DSG did not specifically sue to enforce the provision. The parties now appeal.

## II. STANDARDS OF REVIEW

"A trial court's decision to grant or deny summary disposition is reviewed de novo." *Mr. Sunshine v Delta College Bd of Trustees*, 343 Mich App 597, 601; 997 NW2d 755 (2022). "Summary disposition is appropriate under MCR 2.116(C)(10) if there is no genuine issue

regarding any material fact and the moving party is entitled to judgment as a matter of law." *Id*. (quotation marks and citation omitted). Contractual interpretation is a question of law that is also reviewed de novo. *Klapp v United Ins Group Agency, Inc*, 468 Mich 459, 463; 663 NW2d 447 (2003).

"Whether a party was free from active negligence in an underlying case and thus entitled to common-law indemnification is generally a question of fact for the jury." *Botsford Continuing Care Corp v Intelistaf Healthcare, Inc*, 292 Mich App 51, 60-61; 807 NW2d 354 (2011). A trial court's factual findings after a bench trial are reviewed for clear error, while its legal conclusions are reviewed de novo. *Ladd v Motor City Plastics Co*, 303 Mich App 83, 92; 842 NW2d 388 (2013).

### III. THIRD-PARTY BENEFICIARY COOPERATING BROKER

14 Mack and Signature first argue that the trial court erred by finding that Colliers was a third-party beneficiary cooperating broker entitled to a commission under the ELA. We disagree.[3]

"A court's primary obligation when interpreting a contract is to determine the intent of the parties." *Bodnar v St. John Providence, Inc*, 327 Mich App 203, 220; 933 NW2d 363 (2019). "The parties' intent is discerned from the contractual language as a whole according to its plain and ordinary meaning." *Id*. "When a contract is clear and unambiguous, the provisions reflect the parties' intent as a matter of law and courts are to construe and enforce the language as written." *Id*. "A dictionary may be consulted to ascertain the plain and ordinary meaning of words or phrases used in the contract." *Auto Owners Ins v Seils*, 310 Mich App 132, 145; 871 NW2d 530 (2015).

"A person is a third-party beneficiary of a contract only when that contract establishes that a promisor has undertaken a promise directly to or for that person." *Schmalfeldt v North Pointe Ins Co*, 469 Mich 422, 428; 670 NW2d 651 (2003). Under the ELA, 14 Mack undertook the promise to directly pay a leasing commission to outside brokers who assisted Signature in procuring a lease for 14 Mack. The parties do not dispute that Colliers was the outside broker used by DSG, at least during the Suite 100 negotiations. Hence, Colliers qualifies as an intended third-party beneficiary of the ELA so long as it assisted Signature in procuring "any lease."

As our Supreme Court, citing *Merriam-Webster's Collegiate Dictionary* (11th ed), explained: " 'Any' means 'one, some, or all indiscriminately of whatever quantity.' " *South Dearborn Environmental Improvement Assoc, Inc v Dep't of Environmental Quality*, 502 Mich 349, 368 n 17; 917 NW2d 603 (2018). As such, Colliers's involvement with the procurement of the Suite 500 lease *specifically* is irrelevant; under the ELA, if Colliers assisted in the procurement of *any* lease, it is entitled to a commission. It is undisputed that Signature was ultimately able to

---

[3] We note that DSG argues this Court does not have jurisdiction over Signature's appeal (Docket No. 373163), because Signature's claim of appeal was not timely filed. This Court has denied a motion to dismiss based on the same argument. *Colliers Int'l Detroit LLC v Signature Assoc Inc*, unpublished order of the Court of Appeals, entered July 16, 2025 (Docket No. 373163). Accordingly, we decline to consider the issue again here.

"procure" a lease with DSG for Suite 500. Thus, the remaining question is whether Colliers provided Signature with "assistance" in doing so.

"Assistance" is defined as "the act of helping or assisting someone[.]" *Merriam-Webster's Collegiate Dictionary* (12th ed). Accordingly, if Colliers helped Signature procure *any* lease in some way, it is entitled to a commission, regardless of the fact that DSG terminated Colliers before negotiating the Suite 500 lease directly. As the trial court noted, Colliers initiated the negotiations for the Suite 100 lease and introduced the parties. While a DSG representative testified that he was the one who first found the property, the record reflects that the initial e-mail and contact point came from Colliers. Moreover, the ELA only requires that the cooperating broker "assist," or, in other words, help, with the procurement of any lease. Therefore, even if DSG was the one who found the property first, the facts of this case establish that it was Colliers who introduced the parties, which later resulted in DSG leasing Suite 500. Under the plain terms of the ELA, Colliers was a cooperating broker third-party beneficiary entitled to a commission.[4]

## IV. GOOD FAITH

Next, Signature argues that the trial court erred by finding that it failed to cooperate in good faith with Colliers. We disagree.

As noted earlier, the ELA required Signature to "cooperate in good faith with outside brokers[.]" The ELA does not define "good faith," meaning the term is given its plain and ordinary meaning. *Cole v Auto-Owners Ins Co*, 272 Mich App 50, 53; 723 NW2d 922 (2006). Merriam-Webster defines the term as "honestly or lawfulness of purpose." *Merriam-Webster's Collegiate Dictionary* (12th ed). Similarly, Black's Law Dictionary defines the term as "[a] state of mind consisting in (1) honesty in belief or purpose, (2) faithfulness to one's duty or obligation, (3) observance of reasonable commercial standards of fair dealing in a given trade or business, or (4) absence of intent to defraud or to seek unconscionable advantage." *Black's Law Dictionary* (12th ed).

Signature argues that it did not breach the ELA by failing to act in good faith because it was 14 Mack, not Signature, that repeatedly removed Colliers from the second LOI, and both 14 Mack and Signature reasonably relied on DSG's representation that Colliers had been terminated. As discussed above, any belief that Colliers had been terminated did not excuse 14 Mack or Signature from performing their duties under the ELA, which plainly provided that Colliers was entitled to a commission for assisting Signature in procuring *any lease*. As for the argument that it was 14 Mack that kept removing Colliers from the LOI, the record reflects that Colliers contacted Signature about 14 Mack's behavior and told Signature about its belief that it was entitled to a commission. Signature was plainly aware of Colliers's involvement with the Suite 100 negotiations, which entitled it to a commission under the ELA. Thus, Signature's silence allowed 14 Mack to remove Colliers from the LOI—which also allowed it to claim a higher commission

---

[4] Signature argues that the trial court erred by ordering it to pay part of Colliers's commission damages because it was 14 Mack that bore the burden of paying the commission under the ELA. But Signature was not ordered to pay part of the commission, it was simply ordered to remit the excess 1.5% commission it received as a result of Colliers's exclusion.

than it was entitled—constituted a failure to act honestly and in accordance with its obligations under the ELA.

## V. INDEMNIFICATION

14 Mack and Signature next argue that the trial court erred by finding that neither of them were entitled to contractual or common-law indemnification by DSG. We disagree.

Again, the broker provision of the lease agreement provided that 14 Mack and DSG "acknowledge[d] and agree[d] that neither of them ha[d] used the services of a broker or leasing agent or any other person to whom a commission is or may be owed, other than Signature[.]" It went on to provide that "each party agree[d] to indemnify and hold harmless the other against any claims by a third party for payment of a commission or other fee in connection with this lease." But, particularly relevant here, the lease agreement had another provision barring indemnification if the party seeking it caused the damages through either gross negligence or willful misconduct.

The lease agreement does not define these terms, so they are given their plain and ordinary meanings. *Cole*, 272 Mich App at 53. Grossly negligent conduct is conduct that is "so reckless as to demonstrate a substantial lack of concern for whether an injury result[s.]" *Xu v Gay*, 257 Mich App 263, 269; 668 NW2d 166 (2003). Willful misconduct is conduct that "shows an intent to harm[.]" *Jennings v Southwood*, 446 Mich 125, 139-140; 521 NW2d 230 (1994).

The plain language of the ELA provides that a cooperating broker is entitled to a commission if it assists Signature in procuring *any* lease, and "Michigan law presumes that one who signs a written agreement knows the nature of the instrument so executed and understands its contents." *Watts v Polaczyk*, 242 Mich App 600, 604; 619 NW2d 714 (2000). As the trial court recognized, the evidence demonstrates that both 14 Mack and Signature were acutely aware of Colliers's role in introducing them to DSG and its in-depth involvement with the Suite 100 negotiations. They also knew that Colliers believed it was entitled to a commission for the Suite 500 lease by virtue of either DSG's inclusion of the provision in the LOI it sent to 14 Mack or Colliers's telephone call to Signature. Thus, they were both aware that Colliers, at a minimum, assisted Signature in procuring the Suite 500 lease by introducing the parties and that Colliers was demanding its commission. Despite this, 14 Mack repeatedly removed Colliers from the LOI, and Signature failed to discuss Colliers's concerns with 14 Mack. Both parties can therefore be said to have engaged in gross negligence and willful misconduct, and, accordingly, neither are entitled to contractual indemnification.

For the same reasons underlying their preclusion from claiming contractual indemnification, 14 Mack and Signature cannot claim common-law indemnification.

> The right to common-law indemnification is based on the equitable theory that where the wrongful act of one party results in another party's being held liable, the latter party is entitled to restitution for any losses. The right exists independently of statute, and whether or not contractual relations exist between the parties, and whether or not the negligent person owed the other a special or particular legal duty not to be negligent. Common-law indemnity is intended only to make whole again a party held vicariously liable to another through no fault of

-7-

his own. This has been referred to as passive rather than causal or active negligence. It has long been held in Michigan that the party seeking indemnity must plead and prove freedom from personal fault. This has been frequently interpreted to mean that the party seeking indemnity must be free from active or causal negligence. Therefore, a common-law indemnification action cannot lie where the plaintiff was even .01 percent actively at fault. [*Botsford Continuing Care Corp*, 292 Mich App at 62-63 (quotation marks, brackets, and citations omitted).]

Because the evidence demonstrates that neither 14 Mack nor Signature were free from personal fault, neither party is entitled to common-law indemnification. *Id*.

## VI. ATTORNEY FEES

Finally,[5] DSG argues that the trial court erred by denying its motion for attorney fees because it did not need to file a separate cause of action to recover them. We disagree.

"Michigan courts follow the American Rule with respect to the payment of attorney fees and costs." *Pransky v Falcon Group, Inc*, 311 Mich App 164, 193; 874 NW2d 367 (2015). "Under that rule, each party is responsible for his or her own attorney fees unless a statute or court rule specifically authorizes the trial court to order an award of attorney fees." *Id*. at 194. "However, the parties to an agreement may include within the agreement a provision respecting the payment of attorney fees, which courts will enforce like any other term unless contrary to public policy." *Id*.

The parties do not dispute that the provision awarding prevailing party attorney fees in the lease agreement is enforceable. The only issue is whether DSG properly sought to enforce it. DSG's argument on appeal is premised on a claimed conflict between this Court's decisions in *Fleet Business Credit v Krapohl Ford Lincoln Mercury Co*, 274 Mich App 584; 735 NW2d 644 (2007), and *Pransky*. DSG argues *Fleet* held that a prevailing party does not need to file a separate cause of action to recover prevailing party attorney fees under a contract, a holding to which *Pransky* failed to adhere. But DSG overextends *Fleet*'s holding; *Fleet* merely held that attorney fees provided for in a contract did not need to be specifically identified as special damages. "Special damages are those that are unusual for a type of claim." *Fleet Bus Credit*, 274 Mich App at 589. Because they are "unusual," and likely to surprise the opponent, they must be specifically stated. *Id*. at 589-590. This Court held that prevailing-party attorney fees were not special damages, because they were not unusual or unexpected. *Id*. at 591-592. *Fleet*'s holding was limited to the *categorization* of claims for attorney fees under contract; that is, it only held that a party seeking to recover such fees was not "required to specifically plead its attorney fees *as special damages*." *Id*. at 592 (emphasis added).

---

[5] DSG raises challenges to some of the trial court's other rulings as an alternative issue in the event this Court were to reverse the trial court's orders. Because we affirm, we need not address these alternative challenges.

It was later in *Pransky* that this Court then addressed an issue not covered in *Fleet*: whether a party can recover contractual attorney fees without suing to enforce the provision providing for them. *Pransky*, 311 Mich App at 193-196. *Pransky* noted that, as *Fleet* held, when the authority to award attorney fees arises out of a contractual agreement, "the attorney fees are a type of general damages." *Id*. at 194, citing *Fleet Bus Credit*, 274 Mich App at 589. But this was not the end of the analysis, because "[i]n order to obtain an award of attorney fees as damages under a contractual provision requiring such a payment, the party seeking payment must sue to enforce the fee-shifting provision, as it would for any other contractual term." *Pransky*, 311 Mich App at 194. "That is, the party seeking the award of attorney fees as provided under the terms of an agreement must do so as part of a claim against the opposing party." *Id*. at 195. The fact that *Pransky* requires a party to sue to enforce a prevailing-attorney-fee provision in a contract, "as it would for any other contractual term[,]" *id*. at 194, does not, as DSG claims, "add[] needless procedural steps and . . . increase[] the time and cost of enforcing attorneys' fees provisions." It simply requires a party seeking to enforce a contractual right to sue to enforce that right. Thus, the trial court did not err by denying DSG's motion for attorney fees.

Affirmed.

/s/ Thomas C. Cameron
/s/ Stephen L. Borrello
/s/ Brock A. Swartzle

-9-